1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

PAUL YOUNG KIM,

                          Plaintiff,

        v.

UNITED STATES OF AMERICA,

                          Defendant.

Case No. 5:22-cv-00691-SPG-SP

**ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANT'S MOTION TO DISMISS [ECF No. 16]**

Before the Court is Defendant United States of America's ("Defendant") motion to dismiss ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 16 ("Mot.")).  Having considered the submissions of the parties in support of and in opposition to the Motion, the relevant law, the record in this case, and the arguments during the hearing on the Motion, the Court DENIES, in part, and GRANTS, in part, Defendant's Motion.

## I.    BACKGROUND

The complaint alleges as follows: Paul Young Kim ("Plaintiff") is a United States citizen who, until September 13, 2015, resided in South Korea and was subject to South Korea's social security laws.  (ECF No. 1 ("Compl.")) ¶¶ 1, 7).  Plaintiff relocated to the

-1-

United States and on September 14, 2015, began residing in California. (*Id.* ¶ 8). For the taxable year ending December 31, 2015, Plaintiff timely filed a Form 1040 "U.S. Individual Tax Return" ("2015 Return") with the internal Revenue Service ("IRS"). (*Id.* ¶ 9). In addition to the amount of regular income tax owed, Plaintiff reported in the 2015 Return that he owed $644,382 in Net Investment Income Tax ("NIIT"). (*Id.* ¶ 10). After subtracting payments, Plaintiff requested a refund from the IRS of $140,171 for the 2015 tax year. (*Id.* ¶ 11).

On or about March 16, 2017, Plaintiff filed a 1040X "Amended Individual U.S. Income Tax Return" ("Amended Return") for the 2015 tax year seeking a refund of $638,232 in NIIT Plaintiff had reported and paid based on his original 2015 Return. (*Id.* ¶ 12). Plaintiff attached to his claim for a refund the following statement explaining why Plaintiff believed he was entitled to the requested refund:

> [Plaintiff] was a resident of South Korea through September 13, 2015 and was subject to the Korean National Pension Law. Under the U.S. – Korea Social Security Agreement, a Korean Resident is exempt from the U.S. Social Security tax and Medicare tax. Thus, the Taxpayer should not be subject to the [NIIT] on any income before he became a California resident on September 14, 2015.

(*Id.* ¶ 13). On March 5, 2020, an IRS examiner sent Plaintiff a letter in which the examiner proposed to fully disallow Plaintiff's refund claim. (*Id.* ¶ 14). The IRS examiner wrote that the NIIT was an income tax, not a Medicare tax, and thus not subject to exemption under the U.S. – South Korea Social Security Totalization Agreement ("Totalization Agreement"). (*Id.*). The IRS examiner also concluded in the letter that foreign tax credits could not be used to offset the NIIT. (*Id.*). On March 17, 2020, Plaintiff submitted his response disagreeing with the IRS examiner on both points. (*Id.* ¶ 15).

On May 28, 2020, Plaintiff's CPA submitted a Protest to the IRS disputing the proposed determination. (*Id.* ¶ 16). Attached to this Protest was another Form 1040X "Amended U.S. Individual Income Tax Return" for the 2015 tax year ("Second Amended Return") explaining that it was "filed as a protective claim for a decision that [the NIIT]

could be reduced by Foreign Tax Credit under the U.S. – S. Korea Income Tax Treaty." (*Id.*). On October 19, 2021, the IRS' Independent Office of Appeals sustained the determination made in the IRS examiner's March 5, 2020, letter. (*Id.* ¶ 17). The Independent Office of Appeals found: (1) the NIIT was an income tax, and not a Medicare tax, and thus not subject to exemption under the Totalization Agreement; and (2) foreign tax credits could not be used to offset the NIIT. (*Id.*).

On April 22, 2022, Plaintiff filed a Complaint against the Defendant. The Complaint asserts two claims for a refund of the NIIT. First, Plaintiff requests the Court declare that "[t]he NIIT is a Medicare Tax and Plaintiff is thus exempt from paying NIIT under the Totalization Agreement. (*Id.* ¶¶ 19-23). Alternatively, Plaintiff requests the Court declare that Plaintiff is entitled to Foreign Tax Credits to reduce and offset the entire NIIT paid. (*Id.* ¶¶ 24-25). Defendant filed the instant Motion on July 22, 2022. (Mot.). Plaintiff filed his opposition on October 10, 2022. (ECF No. 19). Finally, Defendant filed its reply on November 2, 2022. (ECF No. 20).

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. Dismissal is proper "when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (citation omitted). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.* at 555 (citation omitted). In other words, a plaintiff must allege sufficient facts to "nudge [] their claims across the line from conceivable to plausible. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citation omitted). In deciding whether the plaintiff has stated a claim upon which relief

can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. Although, in ruling on a Rule 12(b)(6) motion, a court generally may only consider allegations contained in the four corners of the complaint, the court may also consider documents referenced in the complaint but not explicitly incorporated therein without converting a Rule 12(b)(6) motion to a motion for summary judgment if the complaint relies on the documents and their authenticity is not contested. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam); *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001) (citation omitted). Additionally, the Court may consider matters properly subject to judicial notice. *Swartz*, 476 F.3d at 763 (citation omitted). The Court may take judicial notice of matters that are either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

## III.  DISCUSSION

Defendant argues that the Complaint's first claim for a refund should be dismissed because the NIIT is an income tax, not a Medicare tax, and therefore Plaintiff is not exempt under the Totalization Agreement from being taxed on his net investment income. (Mot. at 10-16). Defendant also argues that the Complaint's second claim for a refund should be dismissed because Plaintiff cannot reduce and offset the entire NIIT paid for the 2015 tax year by the Foreign Tax Credit under the United States – Republic of Korea Income Tax Convention. (*Id.* at 16-20). The Court addresses each of Defendant's arguments in turn.

### A.  Plaintiff's First Claim for Refund Based on the Totalization Agreement is Arguably Plausible

Generally, "workers in the United States are taxed to support the payment of social security benefits to the retired and to individuals with disabilities" with the expectation that those same workers, "having contributed to the national economy while actively

employed," will themselves "later become eligible beneficiaries of social security benefits." *Eshel v. Comm'r*, 831 F.3d 512, 514 (D.C. Cir. 2016) (citation omitted). "That system gets complicated, however, for Americans who work overseas for part of their careers and, during those years, are required to pay taxes into a foreign government's social security system." *Id.*

To address the above issue, Congress amended the Social Security Act (the "SSA") in 1977 to authorize the President to enter into agreements creating "totalization arrangements" between the social security systems of the United States and the social insurance or pension systems of a foreign country. SSA 1977, § 317(a), Pub. L. No. 95-216, 91 Stat. 1538. Currently codified as Section 233 of the SSA, the purpose of the amendment was to allow for such totalization arrangements to establish "entitlement to and the amount of old-age, survivors, disability, or derivative benefits based on a combination of an individual's periods of coverage under the social security system" established by the United States and the foreign country. 42 U.S.C. § 433(a). The SSA defines the term "social security system" to mean "with respect to a foreign country, a social insurance or pension system which is of general application in the country and under which periodic benefits, or the actuarial equivalent thereof, are paid on account of old age, death, or disability." 42 U.S.C. § 433(b)(1). "Periods of coverage" is defined by section 433 to mean "a period of payment of contributions or a period of earnings based on wages for employment or on self-employment income . . . ." 42 U.S.C. § 433(b)(2). "Any agreement establishing a totalization arrangement" must provide that "employment or self-employment" or equivalent service will result in a "period of coverage" under the United States social security system or equivalent social security system of the foreign country, "but not under both, and [] the methods and conditions for determining under which system employment, self-employment, or other service shall result in a period of coverage." 42 U.S.C. § 433(c)(1)(B). Such totalization agreements are "intended to aid in the cooperation between two countries who have their own laws and pension systems" and help coordinate between the Social Security system of the United States and foreign systems "to avoid

problems with dual taxation, or with continuity of benefits . . . ."  *Beeler v. Saul*, 977 F.3d 577, 588 (7th Cir. 2020); *see also Eshel*, 831 F.3d at 514 (stating the purpose of totalization agreements is to permit American workers "to combine periods of payment into different countries' social security systems to eventually become eligible to receive benefits under a signatory country's system.").

Along with amending the SSA to authorize the President to enter into totalization agreements, Congress made correlative amendments to the Internal Revenue Code (the "Code") to provide that, during any period during which a totalization agreement is in effect between the United States and a foreign country, the self-employment income and wages of individuals are generally exempt from United States' social-security taxation to the extent that they are subject to taxation under the social security system of the foreign country.  *See* 26 U.S.C. §§ 1401(c), 3101(c), 3111(c)).

### 1. The Totalization Agreement Between the US and Republic of Korea

As alleged in the Complaint, the Totalization Agreement, formally referred to as the "Agreement Between the United States of America and the Republic of Korea on Social Security," was signed on March 13, 2000, took effect on April 1, 2001, *see* Totalization Agreement, at 3, and therefore was in effect throughout 2015 during the periods while Plaintiff resided in Korea and then the United States.  *See* S. Kor.-U.S., Mar. 13, 2000, State Dept. No. 01-54, *available at* https://www.state.gov/wp-content/uploads/2019/02/01-401-Rep.-of-Korea-Social-Security.pdf ("Totalization Agreement").[1]   The Totalization Agreement begins by stating that "The United States of America and the Republic of Korea (hereinafter referred to as the 'Contracting States'), Being desirous of regulating the

---

[1] Plaintiff did not attach a copy of the Totalization Agreement to the Complaint.  However, the Complaint relies on the Totalization Agreement, and its authenticity and contents are not contested.  In addition, both parties in the briefing on the Motion point the Court to various websites and pamphlets where the government documents referenced in the Complaint and briefs can be found.  The Court will take judicial notice of and consider the text of the Totalization Agreement and English translations of Korean laws referenced therein without converting this Motion to a motion for summary judgment.  *See Swartz*, 476 F.3d at 763 (citation omitted); Fed. R. Evid. 201.

relationship between their two countries in the field of Social Security," have agreed to the terms that follow. *Id.* at 5. Part 1, entitled "General Provisions," Article 1, defines "Period of coverage" to mean "a period of payment of contributions or a period of earnings from employment or self-employment as defined or recognized as a period of coverage by the laws under which such period has been completed, or any similar period insofar as it is recognized by such laws as equivalent to a period of coverage." *Id.* at 6. Part II, Article 4 of the Agreement, entitled "Provisions on Coverage," delineates the various situations where a person's employment or self-employment will subject the person to the laws of either Contracting State. It provides in pertinent part:[2]

> 1. [A] person employed within the territory of either Contracting State shall, with respect to that employment, be subject to the laws of only that Contracting State.
>
> 2. Where a person who is normally employed in the territory of one Contracting State by an employer having a place of business in that territory is sent by that employer to work for the same employer in the territory of the other Contracting State, the person shall remain subject to the laws of only the first Contracting State . . . .
>    . . .
> 4. A self-employed person who resides within the territory of one Contracting State shall be subject to the laws of only that state.

*Id.* at 7-8.

Under Part I, Article 1, "Laws" is defined to mean "the laws and regulations specified in Article 2 of this Agreement" and states, "[a]ny term not defined in this Article shall have the meaning assigned to it in the applicable laws." *Id.* at 5-6. Part I, Article 2, Paragraph 1 then sets forth the laws of each Contracting Party that are applicable to the Totalization Agreement. It provides in relevant part:

> 1. For purpose of this Agreement, the applicable laws are:

---

[2] The Complaint does not allege under what circumstances Plaintiff resided in Korea or whether Plaintiff's residency changed because of his employment.

     (a)    As regards Korea,

          (i)    the National Pension Law and the enforcement rules and regulations applicable thereto;

          (ii)    with regard to Part II only, the Industrial Accident Compensation Insurance Law and the enforcement rules and regulations applicable thereto;

     (b)    As regards the United States, the laws governing the Federal old-age, survivors, and disability insurance program:

          (i)    Title II of the Social Security Act and regulations pertaining thereto, except sections 226, 226A and 228 of that title and regulations pertaining to those sections;

          (ii)    Chapters 2 and 21 of the Internal Revenue Code of 1986 and regulations pertaining to those chapters.

*Id.* at 6-7. Article 2, Paragraph 1 does not list as one of the "applicable laws" of the United States the NIIT or Chapter 2A of the Code wherein the NIIT is codified (hereinafter referred to interchangeably as the NIIT or Chapter 2A). Article 2 of the Totalization Agreement does, however, conclude by stating "[t]his Agreement shall also apply to *future laws which amend or supplement*" the laws specified in paragraph 1 of this Article. *Id.* at 7 (emphasis added).

        2.    <u>The Totalization Agreement and its Application to the NIIT, Chapter 2A of the Code</u>

     In this case, the Complaint alleges that Plaintiff "was a resident of South Korea through September 13, 2015 and was subject to the Korean National Pension Law," referenced in the Totalization Agreement. (Compl. ¶ 13). The Complaint further alleges that Plaintiff reported and paid $644,382 in NIIT to the United States based on his original tax return for the 2015 tax year.[3] (*Id.* ¶ 23). However, Plaintiff alleges in the Complaint

---

[3] Although the Complaint alleges Plaintiff was "subject to the Korean National Pension Law," *see* (Compl. ¶ 13), the Complaint does not allege that Plaintiff paid any amount of

and argues in opposition to the Motion that because the NIIT is a Social Security/Medicare tax, it "supplements"[4] Chapters 2 and 21 of the Code and is therefore covered under the Totalization Agreement. *See* (Compl. ¶¶ 19-23); (Opp. at 11-20). As such, Plaintiff asserts that under the Totalization Agreement, he was exempt from having to pay the NIIT on his investment income while residing in South Korea during the 2015 tax year and therefore claim 1 of the Complaint states a plausible claim for a refund of the $644,382. *See* (*id.*). Plaintiff further argues that the Rule 12(b)(6) Motion is not the proper procedure for addressing the merits of Plaintiff's claims. (Opp. at 10-11).

Defendant, on the other hand, argues that claim 1 fails to state a plausible claim for a refund because the NIIT is an income tax that does not "supplement" the applicable laws of the Totalization Agreement and that the plain text of the Totalization Agreement is unambiguous in that regard. Additionally, Defendant argues that because the NIIT does not fall under the Totalization Agreement, Plaintiff's investment income is not exempt from being taxed pursuant to the NIIT. (Mot. at 6-7, 14-16); (Reply at 8). Further, Defendant argues that under Rule 12(b)(6), questions of law may be resolved on a motion to dismiss, and that Plaintiff's Complaint should be dismissed without leave to amend. (Reply at 3).

Thus, to determine whether claim 1 states a plausible claim for relief, this Court must answer whether Chapter 2A of the Code "supplements" Chapters 2 and 21, within the meaning of the Totalization Agreement, applying the interpretive principles applicable to

---

the reported $644,382 in net investment income to the Republic of Korea under either Korea's National Pension Law or Accident Compensation Insurance Law, the two "applicable laws" for Korea referenced in Part I, Article 2, Paragraph 1 of the Totalization Agreement.

[4] Plaintiff does not argue under Part I, Article 2, Paragraph 3 of the Totalization Agreement that Chapter 2A "amends" Chapters 2 or 21 of the Code. *See* (Opp. at 6 ("Since the NIIT does not seek to amend the taxes in Chapter 2 or 21, the question remains whether the NIIT 'supplements' the Chapter 2 and 21 taxes.")). Thus, the Court's analysis will focus on whether Chapter 2A "supplements" the applicable United States laws enumerated in the Totalization Agreement.

such agreements.  This seemingly simple task, however, has proven to be arduous in execution given the absence of legal authority on the underlying subject and, more importantly, the limitations of a Rule 12(b)(6) motion, which generally does not allow for consideration of external materials that could assist in this task (e.g., the drafting history of the agreement, history of the negotiations, official positions of each contracting state regarding its expectations, and other official materials).  As discussed below, based on the inherently broad definition of "supplement," the structure of the Code, and the lack of external materials demonstrating the shared expectations of the Contracting States, it remains *plausible* that Chapter 2A is a "supplement" to Chapters 2 and 21 of the Code and thus, the Court finds it inappropriate to dismiss Plaintiff's first claim using the liberal standard of Rule 12(b)(6).

> a.   *Based on the Broad Meaning of "Supplement" and Structure of the Code, it is Inconclusive at this Stage of the Proceeding Whether Chapter 2A Supplements Chapters 2 and 21 of the Code*

A totalization agreement enacted pursuant to Title 42, United States Code, Section 433(a), is "an executive agreement with a foreign country."  *Eshel*, 831 F.3d at 518. Generally, it is "initiated by the State Department, negotiated by the Social Security Administration, signed by the President and a foreign government, and effective only after submission to Congress."  *Id.* (citation omitted).  As such, the "agreement[] must be interpreted under the same principles applicable to international treaties."  *Id.* (citation omitted)*; Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1408 (9th Cir. 1995) ("Executive agreements . . . are interpreted in the same manner as treaties." (citation omitted)); *Kwan v. United States*, 272 F.3d 1360, 1362 (Fed. Cir. 2001) ("Although not a treaty, treaty principles have been applied to interpreting executive agreements."); *Air Canada v. U.S. Dep't of Trans.*, 843 F.2d 1483, 1486 (D.C. Cir. 1988) (interpreting an international executive agreement "according to the principles applicable to treaties").  Therefore, "[t]he analysis must begin . . . with the text . . . and the context in which the written words are used."  *Air France v. Saks*, 470 U.S. 392, 396 (1985) (citation omitted); *Lozano v. Alvarez,*

-10-

572 U.S. 1, 12 (2014) (stating regarding the interpretation of treaties that, a court's "duty is to ascertain the intent of the parties by looking to the document's text and context . . . ." (internal citations, quotations, and brackets omitted)).  Additionally, because "[t]reaties are construed more liberally than private agreements, [ ] to ascertain their meaning [a court] may look beyond the written words to the history of the [agreement], the negotiations, and the practical construction adopted by the parties." *Air France*, 470 U.S. at 396 (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-32 (1943)) (internal quotations omitted).  Further, the meaning government agencies charged with their negotiation and enforcement attribute to the agreement's provisions is entitled to great weight, although not conclusive. *See Sumitomo Shoji Am. v. Avagliano*, 457 U.S. 176, 184-85 (1982) (citation omitted).  Overall, it is a court's responsibility to read the agreement "in a manner consistent with the *shared* expectations of the contracting parties." *Lozano,* 572 U.S. at 12 (emphasis in original and internal quotations omitted)).  Thus, the clear import of the executive agreement's language controls unless application of the text according to its obvious meaning effects a result inconsistent with the shared expectations of the contracting parties. *See Bank Melli Iran*, 58 F.3d at 1410 (citing *Sumitomo Shoji Am.*, 457 U.S. at 180); *Lozano*, 572 U.S. at 12; *United States v. Stuart*, 489 U.S. 353, 365-66 (1989) (citation omitted); *Eshel*, 831 F.3d at 518.  Finally, if there are two plausible interpretations of a treaty or agreement, "one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *Stuart*, 489 U.S. at 367-368 (citation and internal quotations omitted).

Here, looking to the text of the Totalization Agreement, the term "supplement" is not defined. *See* Totalization Agreement, at Part I, Art. 1, para. 1.  Under such circumstances, Part I, Article 1, Paragraph 2 instructs: "[a]ny terms not defined in this Article shall have the meaning assigned to it in the applicable laws." The "applicable laws" set forth in Part I, Article 2 of the Totalization Agreement are comprised of: (1) two Korean laws enumerated in Paragraph 1.(a), - namely, the National Pension Law and Industrial Accident Compensation Law, along with the rules and regulations applicable thereto; (2)

two United States laws enumerated in Paragraph 1.(b), - namely, portions of Title II of the SSA, Chapters 2 and 21 of the Code, and regulations pertaining to those portions and chapters; and (3) the type of laws at issue in paragraph 3., - namely, "future laws which amend or supplement the laws specified in paragraph 1 of [Article 2]." Because the issue presented in this case is whether Chapter 2A of the Code supplements the enumerated laws of the United States, the Court first considers Chapters 2A of the Code as it relates to Chapters 2 and 21 of the Code to determine whether Chapter 2A "supplements" those laws. *See Eshel*, 831 F.3d at 519 (looking to the French laws specified in a totalization agreement entered into between the United States and France to determine whether two other French laws enacted after the totalization agreement went into effect "amend[ed] or supplement[ed]" the enumerated French laws in the totalization agreement).

As an initial matter, Chapter 2A does not state that it is intended to "supplement" either Chapter 2 or 21 of the Code. Nor is the term "supplement" defined in Chapter 2A, or Chapters 2 and 21. *See* 26 U.S.C. §§ 1402, 1411, 3121. Further, the parties have not submitted external materials that could shed light on what the intended definition of the term was by the Contracting States. As such, and in keeping with the ultimate goal of ascertaining the term as used in the Totalization Agreement, the Court will apply the term's ordinary and plain meaning based on how the term "supplement" was defined by dictionaries around the time the Totalization Agreement was executed. *See e.g.*, *Saks*, 470 U.S. at 399-400 (considering French dictionaries to interpret the French legal meaning of the term "accident," as used in Article 17 of the Warsaw Convention); *see also Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("When interpreting a statute, we must give its terms 'their ordinary and plain meaning,' and follow the common practice of consulting dictionaries to determine how the terms were defined at the time the statute was adopted.") (quoting *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007)); *see also Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning" (internal quotation marks omitted)). As defined in these dictionaries, the term "supplement" is "something that completes or makes an addition."

*Supplement*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993); *see also Supplement, Oxford American Dictionary and Language Guide* (1999) (defining "supplement" to include "2: a part added to a book, etc., to provide further information). With that rather broad definition in mind, the Court considers Chapters 2 and 21 and then determines whether Chapter 2A "supplements" these Chapters.

i.      *Chapters 2 and 21 of the Code*

Chapter 2 of the Code, one of the two Codes specifically referenced in the Totalization Agreement, was enacted by the *Self-Employment Contributions Act of 1954* ("SECA"), and was codified as Title 26, United States Code, Sections 1401 to 1403. The SECA contains employment taxation provisions related to both Social Security insurance and Medicare Insurance.[5]   Specifically, Under Section 1401(a), labeled "Old-age, Survivors, and Disability Insurance" (relating to Social Security insurance), the SECA mandates that, "[i]n addition to other taxes, there shall be imposed for each taxable year, on the self-employment income of every individual," a tax on the amount of self-employment income for such taxable year. *See* 26 U.S.C. § 1401(a). Section 1401(b), labeled "Hospital Insurance" (relating to Medicare insurance), provides that in addition to

---

[5] Title II of the SSA is an insurance program enacted in 1935 that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 76 (1988) (citing 42 U.S.C. §§ 403, 423). Individuals with a certain period "of coverage are entitled to retirement and disability benefits." *Michener v. Kijakazi*, 21 F.4th 1177, 1179 (9th Cir. 2021) (citing 42 U.S.C. § 414(a)(2)). The "period of coverage" credited depends on the amount of time an individual spends in "covered" employment "for which individuals 'pay social-security taxes and are [therefore] entitled to social-security retirement benefits on their earnings.'" *Id.* (quoting *Larson v. Saul*, 967 F.3d 914, 918 (9th Cir. 2020)). By comparison, the Medicare Act, 42 U.S.C. § 1395 *et seq.*, part of the SSA, "establishes a federally subsidized health insurance program" for eligible aged and disabled persons and, among other features, "provides insurance for the cost of hospital and related posthospital services . . . ." *Heckler v. Ringer*, 466 U.S. 602, 605 (2013); *see also Kaiser v. Blue Cross of California*, 347 F.3d 1107, 1109 (9th Cir. 2003) ("Medicare, first enacted in 1965, provides health insurance to eligible aged and disabled persons.").

the tax imposed by Section 1401(a), "there shall be imposed for each taxable year, on the self-employment income of every individual," an additional tax on the self-employment income for such taxable year. *See* 26 U.S.C. § 1401(b). Section 1401 also contains a correlation provision, labeled "Coordination with FICA," that specifically provides that certain taxable amounts set forth in Section 1401, "shall be reduced . . . by the amount of wages taken into account in determining the tax imposed under section 3121(b)(2) [FECA] with respect to the taxpayer." *See* 26 U.S.C. § 1401(b)(2)(B). Finally, Section 1401(c) provides, that during any period in which there is in effect a totalization agreement pursuant to Section 233 of the SSA with any foreign country, "the self-employment income of an individual shall be exempt from the taxes imposed by this section to the extent that such self-employment income is subject under such agreement exclusively to the laws applicable to the social security system of such foreign country" (hereinafter referred to as the "Totalization Provision").

Chapter 21 of the Code, the second United States Code provision specifically referenced in the Totalization Agreement, was enacted by the *Federal Insurance Contributions Act* ("FICA"), and is codified as Title 26, Untitled States Code, Sections 3101 to 3134. Like the SECA, the FICA contains employment taxation provisions related to both Social Security insurance and Medicare insurance. Specifically, Section 3101(a), labeled "Old-Age, Survivors, and Disability Insurance," provides that, in addition to other taxes, a tax is imposed on the wages received by an individual with respect to the individual's employment. *See* 26 U.S.C. § 3101(a). Also, similar to Section 1401(b) of the SECA, Section 3101(b), is labeled "Hospital Insurance," and imposes an additional tax on the wages of every taxpayer which are received for employment during any taxable year …." *See id.* § 3101(b). Finally, like Section 1401(c) of the SECA, Section 3101(c) includes a Totalization Provision that provides that, during any period in which there is in effect a totalization agreement pursuant to Section 233 of the SSA with any foreign country, "the wages received by or paid to an individual shall be exempt from the taxes imposed by this section to the extent that such wages are subject under such agreement

exclusively to the laws applicable to the social security system of such foreign country." *See id.* § 3101(c); *see also id.* § 3111 (containing similar labels and a Totalization Provision for the imposition of taxes on employers of individuals for the wages paid by the employer with respect to the employment); *Univ. of Chi. v. United States*, 547 F.3d 773, 775 (7th Cir. 2008). In sum, both Chapters 2 and 21 provide for Social Security and Medicare tax on active income – namely, employment, self-employment, and wage income. Further, based on the inclusion of both the correlation provision contained in Chapter 2, *see* 26 U.S.C. § 1401(b)(2)(B), and the Totalization Provision contained in Chapters 2 and 21, Congress' intent for Chapters 2 and 21 to relate to one another and be subject to totalization arrangements entered into under Title 42, United States Code, Section 433 is evident.

## ii.     Chapter 2A of the Code

In contrast to Chapters 2 and 21 of the Code, Chapter 2A, titled "Unearned Income Medicare Contribution," was enacted by the *Patient Protection and Affordable Care Act*, 42 U.S.C. § 18001 *et seq.* (2010), and the corresponding *Health Care and Education Reconciliation Act* ("HCERA"), Pub. L. No. 111-152, § 1402(a)(1), 124 Stat. 1029, 1061. Chapter 2A became effective long after the Totalization Agreement was executed and does not contain taxation provisions on self-employment, employment, or wage income related to both Social Security Insurance and Medicare Insurance. Instead, under Chapter 2A, all individual taxpayers are potentially subject to a 3.8 percent tax on their "Net Investment Income." 26 U.S.C. § 1411(a)(1). "Net Investment Income" generally includes any income in excess of: (1) gross income from interest, dividends, rents, annuities, and royalties, other than such income derived in the ordinary course of a trade or business; (2) gross income derived from a trade or business in which the taxpayer does not materially participate; (3) gross income from business of trading in financial instruments or commodities; and (4) net gain from the disposition of property other than property held in a trade or business in which the taxpayer materially participates. *See* 26 U.S.C. § 1411(c). Chapter 2A defines "trade or business," as either: (A) "a passive activity (within the meaning of section 469) with respect to the taxpayer," or (B) a trade or business of trading

in financial instruments or commodities." 26 U.S.C. 1411(c)(2) (emphasis added).  While

section 469 defines "passive activity" as "any activity . . . which involves the conduct of

any trade or business, and in which the taxpayer does not materially participate." 26 U.S.C.

§ 469(c).

Thus, unlike Chapters 2 and 21 of the Code, Chapter 2A is a tax on *passive* income,

instead of active income in the form of wages and earnings from employment or self-

employment.  Also, unlike Chapters 2 and 21, Chapter 2A does not contain a Totalization

Provision exempting the taxes imposed on investment income by that Chapter to the extent

such income is subject under a totalization agreement to taxation pursuant to the social

security system of a foreign country.  *Compare id.* §§ 1401 and 3101, *with id.* § 1411.  Nor

does it appear to contain a provision correlating its terms with either Chapters 2 or 21 of

the Code.  *See id.*

Defendant argues that, based on the differences in statutory structure, "Congress did

not intend to reduce the NIIT liability because of a totalization agreement."  (Mot. at 14-

15).  The Court agrees that the structural differences of Chapter 2A, as compared to

Chapters 2 and 21 of the Code, should be presumed to be intentional.  *See Russello v.*

*United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing

language in the two subsections has the same meaning in each. We would not presume to

ascribe this difference to a simple mistake in draftsmanship.").  Moreover, such differences

suggest that Chapter 2A does not supplement Chapters 2 and 21 within the meaning of the

Totalization Agreement.  Yet, given the broad definition of the term "supplement," these

differences could also mean that Chapter 2A was intended to expand the scope of taxable

income.

Indeed, Plaintiff argues based on Chapter 2A's title that Chapter 2A is intended to

be a source of Medicare tax revenue, "supplementing" the Medicare taxation provisions of

Chapters 2 and 21.  *See United States v. Quality Stores, Inc.*, 572 U.S. 141, 150-51 (2014)

("Captions, of course, can be 'a useful aid in resolving' a statutory text's 'ambiguity.'"

(quoting *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 388-89 (1959)).  This reading is

supported by the legislative history of Chapter 2A. Through the Affordable Care Act, Congress "intended to increase the number of Americans covered by medical insurance and to decrease the cost of medical care." *Coons v. Lew*, No. 13-15324, 2014 U.S. App. LEXIS 17360, at *3 (9th Cir. 2014). To accomplish this, Congress, among other things, sought to increase Medicare-related tax revenue. For example, section 10906(b) of the Patient Protection and Affordable Care Act amended SECA's Medicare Hospital Insurance Tax from 0.5 percent to 0.9 percent on self-employment income. *See* 124 Stat. 1020; 26 U.S.C. § 1401(b)(2)(A); *see also Rules Relating to Additional Medicare Tax*, 78 Fed. Reg. 230 (Nov. 29, 2013) (to be codified at 26 C.F.R. pts. 1 and 31) (explaining the background of the Additional Medicare Tax). Passage of Chapter 2A is consistent with this purpose because it expands Medicare taxation to investment income sources not covered by Chapters 2 or 21 of the Code.[6] Further, the fact that Chapter 2A taxes an income source that is different from Chapters 2 and 21 could arguably suggest that Congress adopted Chapter 2A to supplement Chapter 2's scope of taxation for purposes of Medicare funding.[7]

---

[6] Defendant argues that the Chapter 2A is not a Medicare tax because "Congress allocated the revenues generated from the NIIT separately from revenues generated by FICA and SECA taxes, which are allocated to Federal trust funds for social security and the Supplementary Medical Insurance Trust Fund." (Mot. at 15). This is true; tax revenue generated by the NIIT is allocated to the Treasury general fund. *See* Joint Comm. On Tax'n, *General Explanation of Tax Legislation Enacted in the 111th Congress*, at 363 (JCS 2-11) (Mar. 16, 2011) ("No provision is made for the transfer of the tax imposed by [the NIIT] from the general Fund of the United States Treasury to any Trust Fund."). However, Defendants do not cite any authority stating that this fact renders the NIIT a non-Medicare tax. Further, such a reading ignores the plain text of the title of the statute. Notwithstanding, as discussed below, whether Chapter 2A is a Medicare tax is not alone dispositive of the issues presented by the Motion.

[7] Plaintiff also argues without citation to any authority that, because NIIT was codified as Chapter 2A (as opposed to a standalone Chapter), this suggests that Congress intended to signal a relationship between 2A and 2. However, one would expect based on its inclusion in the Code that Chapter 2A would evince some relational connectivity to these other Chapters. Thus, the argument that, by virtue of its placement within the Code, Chapter 2A supplements Chapters 2 and 21 within the meaning of the Totalization Agreement is not

Thus, because the Court finds from consideration of the Code that the evidence of Congress' intent regarding whether Chapter 2A supplements Chapters 2 and 21 of the Code is not conclusive, the doubt on that question should be resolved in favor of Plaintiff, the taxpayer. *See Fang Lin Ai v. United States*, 809 F.3d 503, 506 (9th Cir. 2015) ("We have held that 'taxing statute[s] must be construed most strongly in favor of the taxpayer and against the government.'" (quoting *Greyhound Corp. v. United States*, 495 F.2d 863, 869 (9th Cir. 1974)); *Xerox Corp. v. United States*, 41 F.3d 647, 658 (Fed. Cir. 1994) ("As a special rule in tax cases, if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." (citations omitted)).

> b.    *However, Based on the Shared Expectation of the Contracting States, Chapter 2A does not Appear to "Supplement" Chapters 2 and 21 of the Code, yet Granting the Motion at this Stage is not Appropriate*

Importantly, the Court's analysis concerning Chapter 2A's relationship to Chapters 2 and 21 does not end with a comparison of these Chapters within the Code. Instead, the Court ultimately must determine whether its conclusion is consistent with the shared expectations of the parties to the agreement when using the term "supplement." *Lozano*, 572 U.S. at 12 (stating that it is a court's responsibility to read the agreement "in a manner consistent with the *shared* expectations of the contracting parties," and that a court "ascertain[s] the intent of the parties by looking to the document's text and context.") (internal quotation omitted). Looking to the text and context of the Totalization Agreement,[8] they provide contextual clues that tend to indicate Chapter 2A does not

---

alone sufficient to nudge Plaintiff's first claim for a refund across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 570.

[8] The Totalization Agreement must be interpreted in the language used by its drafters. *See Zicherman v. Korea Air Lines Co.*, 516 U.S. 217, 221 (1996); *Saks*, 470 U.S. at 399; *Todok*, 281 U.S. at 454. Here, however, there is an English version and a Korean version of the Totalization Agreement. *See* Totalization Agreement. Nevertheless, representatives of both nations authenticated the validity of both translations at the time of the Totalization

supplement Chapters 2 and 21 of the Code within the meaning of the Totalization Agreement.

First, Part 1, "General Provisions," Article 1, the Totalization Agreement defines "period of coverage" to mean "a period of payment of contributions or a period of earnings from *employment or self-employment* . . . ." *Id.* (emphasis added). Similarly, Part II, "Provisions of Coverage," Article 4 of the Totalization Agreement delineates for purposes of determining social security obligations under what circumstances each Contracting State's laws will apply to a person "employed" or "self-employed" within that Contracting State. As previously discussed, Chapter 2A does not tax earnings from employment or self-employment, but, rather, investment income or income otherwise derived from passive sources. *See* 26 U.S.C. § 1411.

Additionally, the Contracting States were deliberate in selecting the type of laws applicable to the Totalization Agreement, with each bearing some relationship to employment, rather than passive investment. Specifically, under the National Pension Law for Korea, employees and employers pay contributions based on the employees' earned income and, when eligible, receive old-age, disability, and survivor benefits based on periods of coverage. *See* National Pension Act 2000 (Act No. 6124) (S. Kor.), *available at* https://elaw.klri.re.kr/kor_service/lawView.do?lang=ENG&hseq=7718. Korea's Industrial Accident Compensation Insurance Law appears to apply to employer businesses and has as its purpose the protection of workers for work-related injuries. *See* Industrial Accident Compensation Insurance Act 1999 (Act No. 6073) (S. Kor.), *available at* https://elaw.klri.re.kr/eng_service/lawView.do?lang=ENG&hseq=8521. For the United States, under Part 1, Article 2, Paragraph 1(b) of the Totalization Agreement, the Contracting States expressly delineated as applicable only "*the laws governing the Federal*

---

Agreement's signing. *See id.* at 16. Further, the Motion challenges the allegations of the Complaint based on the NIIT, as it relates to Chapters 2 and 21 of the Internal Revenue Code. Under these circumstances, the Court concludes it was the "shared expectation" of both nations that the English translation of the Totalization Agreement would control.

*old-age, survivors, and disability insurance program*," then specifically enumerated only Title II of the SSA, which governs "Federal Old-Age, Survivors, and Disability Insurance Benefits," and Chapters 2 and 21 of the Code. Notably, the Contracting States did not list Title XVIII of the SSA, designated "Health Insurance for the Aged and Disabled," commonly known as Medicare, and the United States did not delineate Federal laws governing investment or passive income. Thus, although the Contracting States included in Part I, Article 2, Paragraph 3 a provision for the Totalization Agreement to apply to "future laws which . . . supplement the laws specified in paragraph 1," the language of the Totalization Agreement lends strong support for the conclusion that the Contracting States' shared understanding was that a future law such as Chapter 2A would not apply as a supplement within the meaning of the Totalization Agreement.

To the extent that a question of plausibility remains, the drafting history of the agreement, negotiations, official positions of each Contracting State regarding its expectations, and other official materials would aid the Court in determining the meaning of the term "supplement" within the Totalization Agreement. *See Air France*, 470 U.S. at 396 (stating to ascertain the meaning of an agreement, the court "may look beyond the written words to the history of the [agreement], the negotiations, and the practical construction adopted by the parties."); *Maugnie v. Compagnie Nat'l Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977) ("[I]t is well established that treaty interpretation involves a consideration of legislative history and the intent of the contracting parties." (citations omitted)); *Eshel*, 831 F.3d at 519-21 (stating that in interpreting a totalization agreement, the court should have consulted other sources "illuminating the shared expectations of the contracting parties, such as the negotiation and drafting history, the postratification understanding of the contacting parties," and documents setting forth an authoritative statement of the countries' "official positions or shared expectations;" declarations and letters not establishing an official state position or evincing no authority to speak for the parties to the agreement are not sufficient. (internal quotations omitted)); *see also Sumitomo*, 457 U.S. at 179 (where the court, in interpreting a treaty between the United

States and Japan, assessed whether the plaintiff company was a company of Japan by looking to the treaty language, then considered a cable from the United States Embassy in Tokyo to the Secretary of State relaying the position of the Ministry of Foreign Affairs of Japan, a diplomatic communication from the Embassy of Japan in Washington to the United States Department of State, and an *amicus curiae* brief from the United States Department of State arguing the United States' position on the issue); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (stating while it is the responsibility of the court to interpret agreements between the United States and foreign governments, the meaning given their provisions by government agencies charged with their negotiation and enforcement should be given great weight).

Understandably, however, on this Rule 12(b)(6) Motion, neither party offered any information or materials extrinsic to the Complaint on this specific issue. Yet, "[i]n resolving difficult questions of foreign law and in attempting to ascertain the views of a foreign government on an agreement to which it is a party, courts are empowered to 'insist on a complete presentation by counsel.'" *Eshel*, 831 F.3d at 522 (quoting Fed. R. Civ. P. 44.1, Advisory Committee Notes 1966). The Court considered whether it should convert the Rule 12(b)(6) Motion into one for summary judgment and request additional briefing from the parties. *See Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir.1995) (if material outside the pleadings are submitted and relied on, the Rule 12(b)(6) motion to dismiss should be converted to one for summary judgment under Federal Rule of Civil Procedure 56 (citation omitted)). However, given the stage of the proceedings and the amount of time likely necessary for the parties to obtain official documents and positions from the Contracting States, expert testimony, and/or amicus briefs, the Court has declined to convert the Motion. Accordingly, because it remains plausible that Plaintiff's claim 1 for a refund could state a cognizable claim, dismissal of the claim is not appropriate at this stage of the proceeding. Defendant's Motion as to claim 1 of the Complaint is therefore Denied.

**B.      Plaintiff's Second Claim for Refund Based on Foreign Tax Credits is not Plausible**

As an alternative theory of relief, Plaintiff alleges as his second claim for a refund in the Complaint that, assuming the NIIT is an income tax, as opposed to a Medicare tax, The Convention Between the United States of America and the Republic of Korea for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and the Encouragement of International Trade and Investment, S. Kor.-U.S., June 4, 1976, 30 U.S.T. 5253, https://www.irs.gov/pub/irs-trty/korea.pdf (the "U.S.-S. Kor. Treaty"),[9] allows Plaintiff to offset the NIIT with foreign tax credits.  *See* (Compl. ¶ 16); (Opp. at 20-32).  The Court disagrees.

"The fundamental purpose of a tax treaty is to avoid uncoordinated taxation of an individual's income by two different countries."  *Goosen v. Comm'r*, 136 T.C. 547, 568 (2011).  In general, such treaties "seek to avoid double taxation as well as prevent fiscal evasion."  *Id.*  Like the interpretation of other international treaties, a court's interpretation of a tax treaty "begin[s] with the text of the treaty and the context in which the words are used."  *Baturin v. Comm'r*, 153 T.C. 231, 236 (2019) (citation omitted).  "The plain meaning of the text of a [tax] treaty controls unless its effect is contrary to the intent or expectations of the signatories."  *Id.* at 236-37 (citation omitted).  "However, courts 'may not read international treaties so broadly as to create unintended benefits or to reach parties not within the scope of a treaty's language.'"  *Id.* at 237 (quoting *Int'l Bank for Reconstruction & Dev. v. District of Columbia*, 171 F.3d 687, 691 (D.C. Cir. 1999)).  The Code "applies with due regard to any applicable treaty obligation of the United States."  *Goosen*, 136 T.C. at 568 (citing 26 U.S.C. § 894(a)(1)).

---

[9] Plaintiff did not attach a copy of the U.S.-S. Kor. Treaty to the Complaint.  However, the Complaint relies on the treaty and its authenticity and contents are not contested.  For purposes of the Motion, the Court will take judicial notice of and consider the text of the treaty and English translations of Korean laws referenced therein without converting this Motion to a motion for summary judgment.  *See Swartz*, 476 F.3d at 763; Fed. R. Evid. 201.

On June 4, 1976, the United States and Republic of South Korea entered into the U.S.-S. Kor. Treaty.  In the Letter of Submittal from the President of the United States, incorporated into the U.S.-S. Kor. Treaty, as well as the Proclamation, the treaty explains that its creation is owed to the partnering countries' desire to avoid double income taxation, prevent fiscal evasion, and to encourage international trade and investment.  In general, the U.S.-S. Kor. Treaty provides that a resident of South Korea may be taxed by the United Sates on any income from sources within the United States.  *See* U.S.-S. Kor. Treaty, Article 4(1).  At the same time, the U.S.-S. Kor. Treaty provides that the United States may tax a citizen or resident of the United States as if the U.S.-S. Kor.  Treaty had never taken effect.  *Id.* at Article 4(4).  Article 1 of the U.S.-S. Kor. Treaty, titled "Taxes Covered," states in relevant part:

> (1)   The taxes which are subject of this [U.S.-S. Kor. Treaty] are:
>
>    (a)   In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code (the United States tax), and
>
>    (b)   In the case of Korea, the income tax and the corporation tax (the Korean tax).
>
> (2)   This [U.S.-S. Kor. Treaty] shall also apply to taxes substantially similar to those covered by paragraph (1) which are imposed in addition to, or in place of, existing taxes after the date of signature of this [U.S.-S. Kor. Treaty].

Article 5 of the U.S.-S. Kor. Treaty, titled "Relief from Double Taxation," discusses the use of foreign tax credits to offset income taxation.  Most relevant to the present inquiry is section (1), which states:

> In accordance with the provisions and *subject to the limitations of the law of the United States* (as it may be amended from time to time without changing the principles hereof), the United States shall allow a citizen or resident of the United States as a credit against the United States tax the appropriate amount of Korean tax and, in the case of a United States corporation owning at least

> 10 percent of the voting power of a Korean corporation from which it receives dividends in any taxable year, shall allow credit for the appropriate amount of taxes paid to Korea by the Korean corporation paying such dividends with respect to the profits out of which such dividends are paid.  Such appropriate amount shall be based upon the amount of tax paid to Korea but the credit shall not exceed the limitations (for the purpose of limiting the credit to the United States) provided by United States law for the taxable year.  For the purpose of applying the United States credit in relation to taxes paid to Korea, the rules set forth in Article 6 (Sources of Income) shall be applied to determine the source of income.

*Id.* (emphasis added).

Under the Code, United States citizens are generally taxed on their worldwide income regardless of where they reside.  *Crow v. Comm'r*, 85 T.C. 376, 380-381 (1985) (citation omitted); *see also Jamieson v. Comm'r*, No. 16421-05, 2008 Tax Ct. Memo LEXIS 122, at *3 (2008) (citations omitted).  The Code is divided into subtitles, and subtitles are divided into chapters, which impose separate and distinct taxes.  Section 1, which is in Chapter 1, subtitle A, Income Taxes, of the Code, imposes a tax on the taxable income of individuals (regular tax).  *Compare* 26 U.S.C. § 26(b) (referring to tax imposed by section 1 as "regular tax liability"), *with* 26 U.S.C. § 3301 (imposing a tax on employers on wages that they pay to their employees).  Chapter 1, subtitle A also provides for credits against the section 1 regular tax.  Section 27 provides a credit for "[t]he amount of taxes imposed by foreign countries . . . against the tax imposed by this chapter *to the extent provided in section 901*."  26 U.S.C. § 27 (emphasis added).

Section 901 of the Code, which is also found in Chapter 1, provides an allowance for foreign tax credit against the previously discussed regular tax.  *See* 26 U.S.C. § 901(a). Section 901 states that "the tax imposed by this chapter [1] . . . [is] credited" with specified amounts, described within section 901.  *See id.*  Thus, by its terms, foreign tax credits may only be used to offset taxes imposed by chapter 1 of the Code, such as the section 1 regular tax.  However, the NIIT is codified as section 1411 – which is located in chapter 2A, subtitle A of the Code.  *See* 26 U.S.C. § 1411.  For this reason, the United States Tax Court

in *Toulouse v. Commissioner*, 157 T.C. 49 (2021) concluded that "the foreign tax credit under section 27--which applies to 'the tax imposed by this chapter [1]'--does not by its terms apply to offset [the NIIT]." *Toulouse*, 157 T.C. at 56.

Citing *Toulouse*, Defendant argues that Plaintiff cannot offset the NIIT using foreign tax credits because the "Internal Revenue Code and Treasury Regulation § 1.1411-1(e) explicitly prohibit Plaintiff from reducing the NIIT." (Mot. at 16-18). In the alternative, Defendant argues that the language of the U.S.-S. Kor. Treaty itself prohibits the use of foreign tax credits to reduce or offset the NIIT. (*Id.* at 18-20). In opposition, Plaintiff argues that Defendant's first argument lacks merit because "the Court [in *Toulouse*] got the question (and therefore the answer) in that case wrong." (Opp. at 21). As to Plaintiff's second argument, Plaintiff asserts that Defendant's interpretation of the U.S.-S. Kor. Treaty "undermines [its] purpose . . . to eliminate double taxation, ignores the elaborate treaty mechanisms for how foreign taxes are credited by incorrectly presenting sections 27 and 901 of the Code as 'limitations,' and ignores the general principle established by Congress that treaty [foreign tax credit] entitlement is wider than that contained in the Code." (*Id.*).

"The law is well settled that tax deductions and credits are a matter of legislative grace and the burden of showing clearly the right to the claimed credit is on the taxpayer." *Segel v. Comm'r*, 89 T.C. 816, 842 (1987) (citations omitted). At the onset, the Court acknowledges that Tax Court precedent is not binding authority; nevertheless, it is persuasive. *See, e.g.*, *Gragg v. United States*, 831 F.3d 1189, 1192 (9th Cir. 2016) (citation omitted); *Esgar Corp. v. Comm'r*, 744 F.3d 648, 652 (10th Cir. Mar. 7, 2014) ("[T]he Supreme Court has counseled that, [w]hile [the Tax Court's] decisions may not be binding precedents for courts dealing with similar problems, uniform administration would be promoted by conforming to them where possible.' Rulings by the Tax Court on matters of tax law are therefore persuasive authority, especially if consistently followed.'" (quoting *Dobson v. Comm'r*, 320 U.S. 489, 502 (1943))).

*Toulouse* involved a U.S. citizen-petitioner, residing outside of the United States, who paid $51,456 in taxes to Italy and France in 2013. *Toulouse*, 157 T.C. at 51. On her

Form 1040 of her 2013 Individual Income Tax Return, the petitioner reported a total tax of $63,632, and she claimed a foreign tax credit for the same amount.  *Id.*  The petitioner attached a Form 8960 to her return, which reported NIIT of $11,540.  *Id.*  This amount was in addition to the $63,632 of foreign tax credit that she claimed on her Form 1040.  *Id.* at 51-52.  The petitioner also attached to her return: (1) two Forms 8833, Treaty-Based Return Position Disclosure Under Section 6114 or 7701(b), disclosing her position that she used the foreign tax credit carryover to offset the NIIT, *id.* at 52; and (2) a Form 8275, Disclosure Statement, providing a detailed explanation of her position that article 24(2)(a) of the U.S. income tax treaty with France (referred to hereinafter as, the "U.S.-France Treaty"), and article 23(2)(a) of U.S. income tax treaty with Italy (referred to hereinafter as, the "U.S.-Italy Treaty"), permitted a foreign tax credit against the NIIT.  *Id.*

The respondent, the Commissioner of Internal Revenue, rejected Plaintiff's attempt to offset the $11,540 in foreign tax credits.  *See id.*  In doing so, the respondent informed the petitioner that her claim for a foreign tax credit had been disallowed on the basis that a foreign tax credit is inapplicable against the NIIT.  *Id.*

After unsuccessfully proceeding through a due process hearing process, the petitioner sought review of the decision by the United States Tax Court.  On the issue of whether the petitioner was entitled to foreign tax credits against the NIIT based on certain provisions of the U.S.-France Treaty and U.S.-Italy Treaty, the Tax Court rejected the petitioner's contention.  The Tax Court initially observed that both treaties were "intended to limit the effects of double taxation between the treaty partners and contain specific provisions that provide each country's obligations to grant a foreign tax credit as part of the treaties' general goal of reducing the amount of double taxation."  *Id.* at 58. Nevertheless, the Tax Court found "[u]nder the express terms of the articles of the Treaties that petitioner relie[d] on, any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's provision of a credit."  *Id.*  Citing to the text of Article 24(2)(a) of the U.S.-France Treaty and Article 23(2)(a) of the U.S.-Italy Treaty, which each contain language that states whether to allow a tax credit to a

United States citizen for taxes paid in the foreign country is "subject to the limitations of the law of the United States," the Tax Court found that the plain text upon which the petitioner relied demonstrated such credits were subject to the provisions and limitations of the Code. *Id.* at 59-60. The Tax Court also found that foreign tax credits could not be used to offset NIIT, explaining:

> [C]hapter 1, subtitle A, [also] provide[s] for credits against the section 1 regular tax. *Cf.* ch. 23, sec. 3302(a) (providing a credit against employers' section 3301 tax on wages for amounts contributed to State unemployment compensation funds). Of relevance here, section 27 provides a credit for "[t]he amount of taxes imposed by foreign countries * * * against the tax imposed by this chapter to the extent provided in section 901." Section 901 provides a foreign tax credit against regular tax. It clearly states that "the tax imposed by this chapter [1] * * * [is] credited" with specified amounts. Thus, both sections 27 and 901 clearly provide that the foreign tax credit allowable under the Code reduces only tax imposed under chapter 1, such as the section 1 regular tax. *See also* sec. 61 (defining gross income for purposes of the section 1 regular tax); sec. 63(a) (defining taxable income for those purposes).
>
> *Section 1411 is in chapter 2A, subtitle A, Income Taxes. Thus, the foreign tax credit under section 27--which applies to "the tax imposed by this chapter [1]"--does not by its terms apply to offset net investment income tax.* . . . Section 1411 is the only section in chapter 2A. Congress created that chapter when it enacted the [NIIT]. Health Care and Education Reconciliation Act of 2010, sec. 1402(a)(1). Chapter 2A is titled "Unearned Income Medicare Contribution." The placement of section 1411 in a newly created chapter was not happenstance. An enumerated chapter of the Code to impose a distinct and separate tax is part of the Code's fundamental structure.

*Id.* at 55-56, 59 (emphasis added).

The petitioner in *Toulouse* conceded that the Code did not explicitly provide for foreign tax credits against the NIIT. *Id.* at 57. Nonetheless, the petitioner argued that "article 24(2)(a) of the U.S.-France Treaty and article 23(2)(a) of the U.S.-Italy Treaty provide a foreign tax credit independent of the Code." *Id*. The petitioner also argued that

"the enactment of the [NIIT] in chapter 2A is not a 'limitation' as that term is used in the Treaties." *Id.* at 59. The Tax Court rejected both arguments, stating:

> Petitioner focuses on the term "limitation" and ignores that the treaty provisions on which she relies require any foreign tax credit to be "in accordance with the Code." Those provisions expressly state that any allowable foreign tax credit is subject to the limitations of U.S. tax laws and must be in accordance with the Code. Accordingly, the petitioner to prevail on the basis of the provision she cites, the Code must provide the credit if one exists. . . . There is no provision for any credits against the section 1411 tax. The enactment of a 3.8% [NIIT] as part of chapter 2A is a clear expression of congressional intent that credits against section 1 not apply against the section 1411 tax.

*Id.* at 60. The Tax Court stated that, while the treaties at issue provided for general protection against double taxation, they did not provide – and their purpose was not to provide – absolute protection. *Id.* The Tax Court explained, the "general purpose of the Treaties is to reduce double taxation, but the specific provisions of each treaty must be applied as written." *Id.* (citations omitted). The Tax Court found nothing in the provisions of the two treaties at issue that entitled United States taxpayers to an elimination of all double taxation. *Id.* at 61. Further, the Tax Court found its reading of the U.S.-France Treaty to be confirmed by the Treasury Department's explanation of the treaty. *Id.* at 60-61.

Here, Plaintiff argues that *Toulouse* was wrongly decided because "[t]he proper question . . . was not whether a treaty provides an 'independent basis for a [foreign tax credit]. Rather, the proper question was whether the treaty *required* the United States to grant the FTC regardless of U.S. domestic tax law." (Opp. at 22 (emphasis in original)). The Court disagrees. As previously discussed, the interpretation of a tax treaty, like the interpretation of a statute or any other international treaty, begins with its text. Both treaties at issue in *Toulouse* unambiguously state that their terms should be effectuated "[i]n accordance with the provisions and subject to the limitations of the law of the United States . . . ." And as the *Toulouse* Court found, section 1411 is located outside the textual purview

-28-

of both section 27 of chapter 1, subtitle A and section 901 of the Code – which prescribe when foreign tax credits may be used to offset a tax.

Importantly, Article 5(1) of the U.S.-S. Kor. Treaty at issue here contains identical language to the treaty provisions at issue in *Toulouse*, stating that foreign tax credits will be imposed "in accordance with" and "subject to the limitations of" the Code. As the *Toulouse* Tax Court found, and as this Court also finds, this language unambiguously mandates that any allowed foreign tax credit must conform to the statutory foreign-tax-credit framework already in place. The *Toulouse* Court did not incorrectly frame the legal issue; instead, the *Toulouse* Court did precisely what it should have done – namely, it allowed the text of the relevant treaties and the Code to guide its interpretation.

Further and as stated previously, "[w]hile courts interpret [tax] treaties for themselves, the meaning given them by the department of government particularly charged with their negotiation and enforcement is given great weight." *See Kolovrat*, 366 U.S. at 194. Thus, Treasury Regulations are a great persuasive force because of the expertise of the IRS in administering our nation's tax law. *Redwing Carriers, Inc. v. Tomlin*, 399 F.2d 652, 656 (5th Cir. 1968). Courts must defer to the regulation unless they are unreasonable or plainly inconsistent with the Code. *Comm'r v. Portland Cement Co.*, 450 U.S. 156 (1981); *see also Indep. Ins. Agents of Huntsville, Inc. v. Comm'r*, 998 F.2d 898, 901 n.8 (11th Cir. 1993). Here, the *Toulouse* Court's reading is supported by Treasury Regulation § 1.1411-1I, which states in relevant part:

> Amounts that may be credited against only the tax imposed by Chapter 1 of the Code may not be credited against the section 1411 tax imposed by Chapter 2A of the Code unless specifically provided in the Code. For example, the foreign income, war profits, and excess profits taxes that are allowed as a foreign tax credit by section 27(a), section 642(a), and *section 901*, respectively, *are not allowed as a credit against the section 1411 tax.*

26 C.F.R. § 1.1411-1(e) (emphasis added).

Plaintiff argues that "[i]f the [*Toulouse*] Court's analysis is correct, this would lead to the absurd result that the U.S. could unilaterally avoid its treaty obligations by the simple expedient [sic] of enacting new income taxes in chapters of the Code, in direct violation of the provisions of U.S. tax treaties that make them applicable to identical or substantially similar taxes imposed after the date or signature of the treaty that are in addition to, or in places of, taxes in existence at the time the treaty was signed." (Opp. at 24). In doing so, Plaintiff appears to be arguing that the Court should ignore the plain meaning of the Convention and Code via the absurdity canon of construction, which allows the Court to override the literal terms of a legal instrument. *See United States v. Lucero*, 989 F.3d 1088, 1097-98 (9th Cir. 2021) (discussing the canon). However, "[a]s the Supreme Court has reminded us, this canon is to be employed sparingly. The absurdity doctrine will 'override the literal terms of a [legal instrument] only under rare and exceptional circumstances.'" *Id.* at 1098 (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930)). "To justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense." *Id.* (internal quotations and brackets omitted). Even if the Court were to assume that the absurdity canon applies to tax treaties, Plaintiff has not shown such a level of absurdity. For reasons already discussed, the U.S.-S. Kor. Treaty plainly states that it was not meant to provide absolute protection for double taxation; instead, its terms are limited to those contained within the Code itself. Congress' decision to place the NIIT into a new chapter does not contravene its purpose; rather, it is consistent with that purpose. Thus, because Plaintiff's second claim for a refund is not plausible as a matter of law, it is dismissed.

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Ninth Circuit mandates that the rule be applied with "extreme liberality." *Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991) (citation and internal quotations omitted). However, where amendment would be futile, district court's retain discretion to deny leave to amend. *See Yakama Indian Nation v. State of Wash. Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir.

1999) (internal citations omitted); *see also Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile).

Here, because the Court's determination that the NIIT does not qualify for Foreign Tax Credit forecloses Plaintiff's ability to state a cognizable claim for a refund, granting leave to amend would be futile. The Court therefore dismisses Plaintiff's second claim for relief in the Complaint with prejudice.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion is DENIED, in part, and GRANTED, in part.

**IT IS SO ORDERED.**

Dated:  March 28, 2023

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE